IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TAMMI S. BELL, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
| vs. | )   Civil No. 14-cv-653-SMY-CJP |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
|         Defendant. | ) |

**MEMORANDUM and ORDER**

**YANDLE, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Tammi S. Bell seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for benefits in March, 2011, alleging disability beginning on January 11, 2010. After holding an evidentiary hearing, ALJ Stuart T. Janney denied the application in a written decision dated February 22, 2013. (Tr. 12-23). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

1.     The ALJ erred in weighing the opinion of her treating physician, Dr. Graham.

    2.    The ALJ failed to set forth a legitimate rationale for his adverse credibility determination.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not

> disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20** C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).  *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is

3

important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Ms. Bell was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Shideler v. Astrue,* 688 F.3d 306, 310-311 (7th Cir. 2012). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of left clavicle fracture, right acromioclavicular ("AC") joint arthritis, degenerative disc disease of the lumbar spine, and a history of obesity. He further determined that plaintiff's

4

impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Bell had the residual functional capacity (RFC) to perform work at the light exertional level, with a number of physical limitations. Based on the testimony of a vocational expert, the ALJ found that plaintiff was able to do her past relevant work as a surveyor as that job is generally performed. She was also able to do her past relevant work as a cashier and fast food worker as actually performed by her and as generally performed. She was, therefore, not disabled.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.

**1.    Agency Forms**

Plaintiff was born in 1961, and was 48 years old on the alleged onset date of January 11, 2010. She was insured for DIB through December 31, 2013. (Tr. 141). She had completed one year of college and training in heating and air conditioning installation. (Tr. 146). She had worked in the past as a cashier, heating and air conditioning installer, surveyor's assistant and waitress. (Tr. 146).

Plaintiff submitted a Function Report in April, 2011, in which she stated that she was unable to walk or stand for long periods or to lift and carry heavy items due to back pain. She had pain in her left shoulder area because of a collar bone break which had healed incorrectly. She reported that she tried to do daily activities as she was able, such as folding laundry and light dusting, but she had to stop every half hour for an

5

hour or so. (Tr. 155-168).

After her application was initially denied, plaintiff submitted a Disability Report-Appeal form in which she said she had gotten worse since her last report. She no longer did much around the house because, after any type of physical activity, she was in so much pain that she could not walk or get out of bed for several days. She was taking a number of medications, which made her forgetful. Her doctor wanted her to have an MRI of her shoulder, but she had no insurance. (Tr. 223-227).

### 2. Evidentiary Hearing

Ms. Bell was represented by an attorney at the evidentiary hearing on January 29, 2013. (Tr. 31). She was 51 years old. She was 5' 8" tall and weighed 160 pounds. Her weight had once gotten up to 182 pounds. She lived with her husband, 25 year old son, 17 year old daughter, and her 83 year old mother. Her husband was a retired firefighter. (Tr. 34-36).

Plaintiff had no health insurance. She had a Medicaid card at one time, but was no longer eligible. (Tr. 36-37).

Ms. Bell lost her job in 2008. She had recently gotten married, and she and her husband tried living on his salary alone. She picked January 11, 2010, as her onset date because she had a fall and knew that she would not be able to work after that. (Tr. 37).

Plaintiff testified that she had back problems on and off for most of her life, but it had "increased greatly in the last few years." She had a constant ache in her low back. The pain sometimes spread to her buttocks and down her right leg. (Tr. 43-44). Her back pain flared up after activity, and then she had to take it easy for several days. She

6

took Oxycodone, which took the edge off the pain but did not eliminate it. (Tr. 46).

In January, 2010, she fell on ice and broke her left clavicle. An orthopedic doctor put her in a brace, but she did not have a good recovery. After that, her back started hurting all the time. She could not lift anything high with her left arm. She had pain radiating from her left shoulder around to her neck such that she could turn her head. (Tr. 47-48).

Plaintiff testified that she also had pain in the joints in her hands, mostly on the right. This began about six months before the hearing. Her doctor wanted to do testing because she has a family history of rheumatoid arthritis. She was unable to afford the testing. (Tr. 48-49).

Ms. Bell sometimes used a cane to walk. She had asked Dr. Graham about using a cane, and he said to do so if helped. (Tr. 50-51). She used a cane whenever she left the house. (Tr. 61).

Her pain and inability to do anything made her depressed and caused her stress. She had difficulty concentrating and making decisions. (Tr. 60). She had two to three panic attacks a month. (Tr. 62-63).

At the time of the hearing, plaintiff was taking Oxycodone, Prozac, Trazodone, a muscle relaxer, and Lorazepam for panic attacks. She had side effects of memory loss and feeling dazed. (Tr. 62).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to do work at the light exertional level,

7

limited to only occasional balancing, stooping, crouching, kneeling and crawling, with only frequent reaching with the left upper extremity and only occasional overhead reaching. The VE testified that this person could do plaintiff's past work as a surveyor helper as that job is generally performed, and could also do her past work as a fast food worker and a cashier or counter clerk as actually and generally performed. (Tr. 67-68).

### 3. Medical Treatment

Ms. Bell was seen in the emergency room on January 11, 2010. She had fallen on ice and was diagnosed with a left AC joint separation and a fractured left clavicle with 100% displacement. She was placed in a splint and instructed to follow up with an orthopedic doctor the next day. (Tr. 277-279).

Plaintiff was seen four times at Southern Orthopedic Associates in Herrin, Illinois, between January 13, 2010, and May 5, 2010. She was treated with a Figure 8 brace and pain medication. On the last visit, she had full range of motion with mild tenderness. The doctor noted that the "position is not anatomical but should be functional." He noted that her recovery had been uneventful and she was doing well. She was able to return to normal activities. (Tr. 291-295).

Plaintiff received primary health care from Dr. Chabra at Goreville Family Practice. She was prescribed Prozac for depression in 2009. (Tr. 354). She went to the emergency room for a panic attack in December, 2009. (Tr. 347). After she was discharged by the orthopedic doctor, she saw her primary care physician for pain in her left clavicle. She was prescribed Hydrocodone, Robaxin and a Medrol dose pack. (Tr. 337). She was seen for low back pain in December, 2010. The doctor noted that she

walked "stiffly & crooked." She said she had seen a chiropractor for similar complaints in the past. The doctor prescribed medication and recommended an MRI. (Tr. 331). The MRI showed slight disc degeneration at L5-S1 with limited narrowing of the neural foramina. (Tr. 359). The primary care physician suggested a consultation with a neurosurgeon. (Tr. 330).

Dr. Jeffery Jones, a neurosurgeon, saw plaintiff on March 11, 2011. He noted degeneration at L5-S1, but did not see any signs of instability or severe nerve root compression. He recommended SI joint injections and physical therapy. (Tr. 323-325).

Plaintiff's first physical therapy session was on March 14, 2011. She said that she had difficulty with sitting and standing. She was to have therapy two to three times a week for four to six weeks. (Tr. 372). The therapist noted soft tissue restriction and muscle spasms. (Tr. 367).

On March 18, 2011, Dr. Brent Newell administered bilateral SI joint injections on referral from Dr. Jones. Dr. Newell noted that she moved guardedly. Patrick's test was positive and single straight leg raising was positive for centralized pain. She had no radicular symptoms. He also prescribed Naprosyn, an anti-inflammatory drug. (Tr. 388-391).

Plaintiff had to discontinue physical therapy on March 24, 2011, because she lost her insurance coverage. (Tr. 361).

Dr. Adrian Feinerman performed a consultative physical examination at the request of the agency in May, 2011. (Tr. 405-412). He reviewed medical records consisting of progress notes dated December 10, 2009, and January 11, 2010. The

9

examination, which took 21 minutes, was basically normal except for some restriction of the range of motion of the lumbar spine.

David Warshauer, Ph.D., performed a consultative psychological examination on August 2, 1011. He diagnosed major depressive disorder, recurrent, mild, and panic disorder without agoraphobia. (Tr. 415-418).

Ms. Bell continued to be seen at Goreville Family Practice in 2011 for complaints of pain in her low back and left clavicle. Dr. Chabra noted tenderness and paraspinal muscle spasms on several visits. He also observed that she walked stiffly. In September, 2011, she called the office in tears. She said she could not get out of bed, and had taken all of her Hydrocodone. She could not afford to go to the emergency room. In November, 2011, her back pain was radiating into her right buttock and leg. (Tr. 443-449).

In January, 2012, a nurse practitioner at Goreville Family Practice wrote that Ms. Bell showed "exaggerated response to palpation." (Tr. 460).

Ms. Bell began seeing Dr. Eric Graham as her primary care physician on April, 24, 2012. She complained of pain in her low back and left shoulder. Her low back pain was constant, severe and aching, and it radiated to her right buttock. On exam, Dr. Graham did not note any abnormal findings with regard to her back. He diagnosed shoulder pain, low back pain and insomnia associated with anxiety. (Tr. 475-477). In July, 2012, Dr. Graham increased her pain medication in response to her complaints of continued lumbar pain. (Tr. 472-474). In October, 2012, plaintiff saw Dr. Graham for insomnia associated with anxiety and low back pain. She said her pain was worse with

10

walking, and she had some relief with ice and heat. On exam, she had pain to palpation in the cervical and lumbar spine, and spasm of the right cervical paraspinal muscles. He prescribed Relafen, a nonsteroidal anti-inflammatory drug, and discontinued Flexeril. He also refilled her Hydrocodone, Lorazepam and Trazodone. (Tr. 466-468). In November, 2012, she again complained of back pain. Dr. Graham also noted a moderate degree of depression. On exam, she seemed to be in moderate pain and was tearful. Dr. Graham wrote that her "back problems are getting much worse. She is trying to keep active, but she is developing more pain because of it." He also noted that she had no insurance and "is again refusing to do more imaging for diagnostic purposes." He changed her pain medication from Hydrocodone to Percocet. (Tr. 463-465). In December, 2012, she presented with a number of complaints, including an acute viral syndrome, low back pain and anxiety with depression. (Tr. 479-481).

  **4.**  **Dr. Graham's Opinion**

On January 25, 2013, Dr. Graham completed a form in which he assessed plaintiff's physical condition. He had last seen her on January 24, 2013, but there is no office note from that visit in the transcript before the ALJ. He wrote that Ms. Bell had chronic low back pain and left shoulder pain since 2010. He estimated that she could work less than an hour a day. He said that she could sit for two hours at a time and stand for 15 minutes at a time. She could occasionally lift only ten pounds. She could never climb stairs or ladders, never stoop, and could not use her right hand for repetitive fine manipulations or simple grasping. (Tr. 482-486).

  **5.**  **Records not before the ALJ**

11

The transcript contains medical records that were not before the ALJ. As of the time the ALJ issued his decision, the medical records consisted of Exhibits 1F through 20F, i.e., Tr. 261 through 486. See, List of Exhibits attached to ALJ's decision, Tr. 24-28.

Plaintiff submitted additional records to the Appeals Council, which considered them in connection with her request for review. See, AC Exhibits List, Tr. 6. Thus, the medical records at Tr. 487-521, designated as Exhibit 21F, were not before the ALJ.

The medical records at Tr. 487-521cannot be considered by this Court in determining whether the ALJ's decision was supported by substantial evidence. Records "submitted for the first time to the Appeals Council, though technically a part of the administrative record, cannot be used as a basis for a finding of reversible error." *Luna v. Shalala*, 22 F3d 687, 689 (7th Cir. 1994). See also, *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008).

## Analysis

Plaintiff's first point, regarding the weight given to Dr. Graham's opinion, is dispositive.

As the ALJ appreciated, if Dr. Graham's opinion were accepted, plaintiff would be deemed disabled. However, he gave "very little weight" to Dr. Graham's opinion except for his opinion regarding plaintiff's ability to reach. He rejected all other limitations proposed by Dr. Graham for the following reasons:

1. The ALJ perceived that Dr. Graham's exertional limitations were internally inconsistent.

2. Dr. Graham's opinion conflicted with the results of the MRI and an exam done in March, 2011.

3. Dr. Graham restricted plaintiff from climbing stairs, but plaintiff testified that she could climb stairs with breaks.

4. There were no clinical findings that would support his limitation in ability to stoop.

5. Dr. Graham included a limitation on use of plaintiff's right hand, but plaintiff related most of her reaching problems to her left upper extremity.

6. They are "inconsistent with the clinical findings and subjective function reporting before the August 2011 initial claim denial."

See, Tr. 21.

The ALJ is required to consider a number of factors in weighing a treating doctor's opinion. The applicable regulation refers to a treating healthcare provider as a "treating source." 20 C.F.R. §404.1527(c)(2) states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

Obviously, the opinions of treating doctors are not necessarily entitled to controlling weight. Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

It is the function of the ALJ to weigh the medical evidence, applying the factors

13

set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. See, 20 C.F.R. §404.1527(d). In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527(d).

In weighing the medical opinions, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).

Here, the ALJ failed to analyze the treatment notes of either Dr. Chabra or Dr. Graham. The only reference to the treatment rendered by either doctor was the ALJ's assertion that, in January, 2012, plaintiff's treating physician noted that her complaints of chronic back pain were inconsistent with the MRI, and also noted "exaggerated responses to palpitation [sic]." (Tr. 19). In fact, the note to which the ALJ refers was written by a family practice nurse at Goreville Family Practice, and not by plaintiff's treating doctor. The note actually says "exaggerated response to palpation of L/S and difficulty of ambulation. L shoulder stiffness." The nurse's assessment was left shoulder and low back pain. She prescribed Hydrocodone, Prozac, Trazodone and Flexeril. (Tr. 460).

14

Ms. Bell was treated at Goreville Family Practice from at least January 2009, to early 2012. She was then seen by Dr. Graham from April, 2012, through at least January, 2013. The ALJ mentioned only one note from this lengthy period, that is, the nurse's note from January, 2012. The ALJ interpreted the nurse's note to be an indication that plaintiff was deliberately exaggerating her symptoms. This is a dubious conclusion. The Seventh Circuit has pointed out that a note indicating an "exaggerated pain response" is not an accusation of malingering. Rather, it is "medical jargon for a patient's experiencing more pain than his purely physical problems . . . would be expected to cause." *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015). Further, the nurse prescribed Hydrocodone and Flexeril at that visit, which seems an unlikely choice if the nurse believed that Ms. Bell was lying about the degree of her pain.

Rather than analyze the records of Goreville Family Practice and Dr. Graham's office, the ALJ compared Dr. Graham's opinion to the results of Dr. Newell's exam and the lumbar MRI. Dr. Newell's exam took place in March, 2011. (Tr. 454). The MRI was done in December, 2010. (Tr. 358).

Ms. Bell testified, and Dr. Graham's notes agree, that her back condition progressively worsened. Therefore, interpreting the MRI and Dr. Newell's exam results as conflicting with Dr. Graham's opinion is "faulty logic." *Scrogham v. Colvin*, 765 F.3d 685, 696-697 (7th Cir. 2014). For the same reason, rejecting Dr. Graham's opinion because it was inconsistent with plaintiff's Function Report from before August, 2011, is also suspect. And, the ALJ erred in neither considering nor explaining his decision not to consider the records of Goreville Family Practice and Dr. Graham's office.

15

*Ibid*, at 698.

The ALJ's other reasons are also invalid. He perceived that Dr. Graham's exertional limitations were internally inconsistent, but this perception was based on a misreading of Dr. Graham's report. Dr. Graham filled out a preprinted form. Question 5 asked, "If you do not believe your patient can work an 8-hour day, how many hours a day can he/she work?" Dr. Graham wrote "<1." The next question asked the doctor to indicate his opinion by circling or otherwise marking numbers on a chart:

> If your patient can work on a sustained, 5-day per week basis, in an 8-hour work day, how many hours can your patient:
>
> (a)  stand  0   1   2   3   4   5   6   7   8
>
> (b)  walk   0   1   2   3   4   5   6   7   8
>
> (c)  sit    0   1   2   3   4   5   6   7   8

Tr. 483.

Consistent with his answer to number 5, Dr. Graham handwrote "N/A" on the chart of numbers. The ALJ interpreted this to be an indication that Dr. Graham meant to mark the "0" to indicate that plaintiff could sit for less than an hour a day, which was inconsistent with his answer to 6(d), that she could sit for two hours at a time. However, an examination of Dr. Graham's handwritten note on the chart of numbers clearly indicates that the ALJ misread his answer.

The ALJ thought that Dr. Graham's limitation to no climbing of stairs was inconsistent with plaintiff's testimony that she could climb stairs "with breaks." The ALJ's conclusion misstates plaintiff's testimony. Plaintiff testified that she could climb

16

stairs using a cane, going down one step at a time, and going up a couple of steps and resting halfway. (Tr. 54). The ALJ said that there was no evidence to support Dr. Graham's limitation in the use of plaintiff's right hand, but she testified that she began having right hand symptoms about six months before the hearing, and that she was unable to afford testing to investigate the presence of arthritis. (Tr. 48-49).

In sum, the reasons given by ALJ Janney for rejecting most of Dr. Graham's opinion are the product of his highly selective and erroneous review of the evidence. Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Kastner v. Astrue,* 697 F.3d 642, 646 (7th Cir. 2010), *citing Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

The Court also agrees that the ALJ's credibility determination was erroneous. The ALJ found plaintiff not to be believable because she reported an increase in her symptoms after her claim was initially denied in August, 2011. The ALJ thought that, because there was no "objective evidence" confirming her reports, she was motivated by "secondary gain." (Tr. 19). This line of reasoning is erroneous, for several reasons. First, an ALJ is not permitted to reject allegations of pain based solely on lack of objective confirmation. *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015). Further, the records of Goreville Family Practice reflected complaints of increased pain, but the ALJ failed to mention them. (Tr. 443- 44). And, in relying on the lack of objective evidence, the ALJ ignored the fact that plaintiff had no insurance coverage. See, *Garcia v. Colvin*, 741 F.3d 758, 761-762 (7th Cir. 2013). Dr. Graham's office notes confirm that she was unable to undergo additional imaging studies for diagnostic purposes because she had no

17

insurance. (Tr. 465). The ALJ said that plaintiff's condition improved with cortisone shots and physical therapy, but this conclusion is not supported by the record. Rather, the record established that she had to quit therapy after attending only a few sessions because her insurance coverage ended. (Tr. 361). The ALJ also relied on the fact that "no treating or examining physician has recommended surgical intervention." (Tr. 20). The idea that a person having as much pain as plaintiff claimed would have been offered surgery is "a medical conjecture that the administrative law judge was not competent to make." *Voigt v. Colvin*, ___ F.3d ___, 2015 WL 1346192, *3 (7th Cir., March 26, 2015). Lastly, the ALJ incorrectly stated that plaintiff took only non-narcotic medications for her back and shoulder pain. (Tr. 20). In fact, she was prescribed Hydrocodone and Percocet, both narcotic drugs. See, www.drugs.com/hydrocodone; www.drugs.com/percocet, accessed on March 27, 2015.

The ALJ is "required to build a logical bridge from the evidence to his conclusion." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015)(internal citation omitted). ALJ Janney failed to do so here. As a result, his decision is lacking in evidentiary support and must be remanded. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Bell was disabled during the relevant period, or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Tammi S. Bell's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATED:   April 16, 2015

s/ Staci M. Yandle
**STACI M. YANDLE
DISTRICT JUDGE**
